Per Curiam.
We are of tlie opinion that the twelfth clause-of the contract between the parties should be construed to mean that if, excluding the 1,000 cords therein reserved, there should not be as' much as three cords per acre, then the defendant agreed to pay to the plaintiff one dollar per cord for the said 1,000 cords- *157 to the extent only that the said lands failed to produce the said three cords per acre, and that, therefore, the liability of the defendant under said clause would not, in any event, exceed the sum of $1,000.
We are also of the opinion that the complaint states a cause of action. The contract is a part of the complaint. It is alleged that, excluding the 1,000 cords that were reserved by defendant, the land embraced in the contract actually produced 992-J cords less than three cords per acre; that the plaintiff has made payments on the contract, and relying on its provisions, has overpaid the defendant, for all liability existing under the contract from the plaintiff to the defendant, the sum of $992.50 ; that in consequence of such overpayment the defendant is liable to repay the same to plaintiff, and the plaiñtiff has, before suit, demanded the same, and no part thereof has been paid; that the plaintiff has fully performed all of the provisions of the contract to be performed by him. It is suggested on the part of the defendant that he has already paid one dollar per cord for the 1,000 cords reserved, and that this action is to recover for a deficiency beyond that. This, however, does not appear from the complaint. It follows that the demurrer is not well taken, and that the judgment must be reversed.
Interlocutory judgment reversed, without costs of appeal to either party, and demurrer overruled, with costs, with leave to the defendant to answer on payment of the costs of the demurrer
The contract referred to in the opinion is as follows:
“(1) This agreement, made and entered into on the 5th day of May, 1888, by and between Theodore B. Basselin, of the town of Croghan, Lewis county, New York, of the first part, and Samuel Branaugh, of Carthage, New York, of the second part, witnesseth:
“(2) Whereas, the party of the first part hereto, by and in virtue of an agreement in writing, dated March 3, 1888, purchased of Mary L. Fisher all of the Hemlock bark on trees over one foot in diameter at a height from the ground as is customary for lumbermen to cut said tree for bark, standing and growing on the four west ranges of township four (4) Brown’s tract, Lewis county, New York, on all the lands in said township, all in Lewis'county, and owned by said Mary L. Fisher, and lying north of the village, lots (so called) as surveyed by N. J. Beach, excepting and reserving the lands adjoining Beaver Lake, Francis Lake, and Beaver Pond; the reserve line to be determined by actual survey, to be made by said Mary L. Fisher, at her expense, on or before the first day of August, 1888, for the purpose of preserving in a state of nature the lands surrounding the lakes and ponds aforesaid.
“(3) And whereas, by the terms of said contract, said Fisher is to cause said timber land to be surveyed into lots of about one hundred and sixty acres each, as near as may be, and cause the lots so surveyed to be numbered for designation:
“(4) Now, for value received, and in consideration of the mutual obligations and agreements herein set forth and contained, the party of the first part agrees to sell, and does hereby sell, to *158 the party of the second part hereto, and the party of the second part doth hereby agree to and does purchase of tile party of the first part, all the hemlock bark purchased by the party of the first part hereto from Mary L. Fisher by and in virtue of the contract hereinbefore referred to, and to which contract reference is hereby made for greater particularity and for the following price, which the party of the second part agrees to pay to the party of the first part, as .follows:
“(5) Three dollars and sixty cents per acre for the hemlock bark on each and every acre of said land aforesaid', and, in case said lands yield more than an average of 6,000 pounds of hemlock bark per acre, then and in that case the party of the second part agrees to pay the party of the first part the additional sum of one dollar for each additional 2,00*0 pounds of hemlock bark.
“(6) The payments under this contract shall be made as follows, viz.: $5,000 at the date hereof; and balance, at the rate of $3.60 per acre for the entire acreage, shall be paid in four equal annual installments,—the first installment payable November 1, 1888; the second installment payable November 1,1889; the third installment payable November 1,1890, and the fourth installment payable November 1,1891,—with interest upon all sums unpaid with each installment. In case the said lands yield more than an average of 6,000' pounds of hemlock bark to the acre, as above referred to, the excess over said 6,000 pounds to the acre, at the said rate of one dollar for each additional 2,000 pounds of hemlock bark, shall be paid to said Basselin by said Branaugh, with interest from April 1, 1888, when each 500 cords are delivered at the tannery of party of the second part.
‘‘(7) The party of the second part shall peel and remove at least one thousand cords of bark during the first year, after April 1, 1888, and at least four thousand cords of bark each year .after that, until all the hemlock bark upon said lands as aforesaid is peeled and removed pursuant to this contract.
“(8) In case said Branaugh shall cut over or remove the hemlock bark from more than one thousand acres of said lots in any one year, then and in that event the party of the second part, shall, in addition to the annual payment, based upon acreage as. above provided, pay to said Basselin, on the first day of November of that year, $3.60 for each additional acre so cut in excess of the one thousand acres, with interest thereon from the date hereof.
“(9) It is further agreed that the bark shall be peeled and taken off by lots (lots to be surveyed as aforesaid), and the party of the second part is to cut over and peel the bark on said lots but once..
“(10) The party of the second part agrees to exercise great care not to injure or destroy any timber or bark, except as shall be absolutely necessary in peeling said bark and removing the-same, and, in case of failure, to pay all damages therefor.
“(11) It is further agreed that the party of the second part, shall remove the bark peeled to his tannery as soon as practicable-after it is peeled, having reference to seasons and conditions of roads; and it is further agreed that, when said bark is taken te said tannery, it shall be fairly and honestly weighed by the party *159 of the second part, and an accurate detailed account of the net and gross weight of all of said bark delivered during the month be delivered by the said party of the second part to the party of the first part on the first day of each and every month.
“(12) It is further agreed that the party of the first part reserves from this sale 1,000 cords of bark, with the right to enter upon said land and take the same away. But it is agreed that if, excluding the said 1,000 cords, there shall not be as much as three cords per acre of bark upon said lands, then party of the first part is to pay to party of* the second part $1.00 per cord for the said 1,000 cords, or $1.00 per cord to the extent that the said lands fail to produce said three cords per acre.
“(13) And it is further agreed that, in the case of failure of the party of the second part to so remove, weigh, and account for said bark, then the party of the first part may measure the bark peeled, for the purpose of ascertaining amount of payments due as above provided, and the amount unpeeled or undelivered covered by this contract, if any, at the date of its expiration; it being expressly understood that each and every cord of bark herein referred to shall be accounted for at and for the rate of 2,000 pounds per cord of bark.
“(14) It is further agreed that no hemlock bark shall be taken, cut, or removed from said lands by the party of the second part, after 1st day of April, 1895, at which time the rights of the party of the second part, under this contract, shall cease and terminate; but the failure on the part of the party of the second part to remove said bark during the period aforesaid shall not relieve the-said party of the second part from this liability to pay therefor at the rates, time, and in the manner above provided by this contract.
“(15) It is further agreed that, until said bark is fully paid for as aforesaid, the title thereto shall be and remain in the vendor.
“(16) It is expressly agreed that in case said Basselin fails to make payments to said Fisher, under the contract aforesaid, at maturity, thereby impairing the rights of the party of the second part under this contract, said Branaugh may make said paj^ments in default, and hold said Basselin’s contract aforesaid as collateral security for the payment so made, until the amount thereof is realized, from bark or otherwise, by the party of the second part hereto.
“(17) It is further agreed that this contract shall not be assigned or transferred by the party of the second part without the written consent of the party of the first part.
“(18) It is further agreed that this agreement shall apply to and bind the representatives of the respective parties hereto. It is further agreed that, if party of second part fails to make payments as herein provided, party of the first part may declare this contract void and of no effect.
“In witness whereof the parties hereto have hereunto set their hands and affixed their seals this 5th day of May, 1888.”